# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*
A WESTERN DIGITAL 2 TB HARD DRIVE, CURRENTLY
STORED BY THE CHILD EXPLOITATION AND OBSCENITY
SECTION OF THE DEPARTMENT OF JUSTICE, LOCATED
AT 1301 NEW YORK AVENUE, WASHINGTON, DC 20530

)
)
)
)
)
)
)

Case No. 25-SW-51

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252(a)(2) (Distribution/Receipt of Child Pornography);  18 U.S.C. §§ 2252(a)(4)(B) (Possession of Child Pornography). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Orlando, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means)*.

Date:    3/4/2025

City and state:    Washington, D.C.

_____
*Judge's signature*

Moxila A. Upadhyaya
(United States Magistrate Judge)

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  25-SW-51 |
| A WESTERN DIGITAL 2 TB HARD DRIVE, CURRENTLY | ) | |
| STORED BY THE CHILD EXPLOITATION AND OBSCENITY | ) | |
| SECTION OF THE DEPARTMENT OF JUSTICE, LOCATED | ) | |
| AT 1301 NEW YORK AVENUE, WASHINGTON, DC 20530 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia. *(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____March 18, 2025_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Moxila A. Upadhyaya_____ .
                                                                                              *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____3/4/2025_____

City and state: _____Washington, D.C._____

_____
*Judge's signature*

Moxila A. Upadhyaya
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>25-SW-51 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is a Western Digital 2 TB hard drive, S/N WX62AC0C3XRC, hereinafter, "TARGET DEVICE." TARGET DEVICE is currently stored by the Child Exploitation and Obscenity Section of the Department of Justice, located at 1301 New York Avenue, Washington, DC 20530.

## ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to the commission of 2252(a)(2) (distribution/receipt of child pornography) and 2252(a)(4)(B) (possession of child pornography) (the "TARGET OFFENSES") as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

    a.   Establishing or documenting the commission of the TARGET OFFENSES;

    b.   Identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

    c.   Reflecting the ownership and use of the item identified in Attachment A by the individual committing the TARGET OFFENSES;

    d.   Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

    e.   Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

    f.   Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES, to include child pornography;

h.  Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the TARGET OFFENSES;

i.  Child erotica;

j.  Any communications related to the sexual exploitation of minors;

k.  Any records and information relating to the use of TOR;

l.  Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

m.  Evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

n.  Evidence of software, or the lack thereof, that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

o.  Evidence of the attachment to the Device of other storage Device or similar containers for electronic evidence;

2

p.  Evidence of counter-forensic programs (and associated data) that are designed to
    eliminate data from the Device;

q.  Evidence of the times the Device was used;

r.  Passwords, encryption keys, and other access Device that may be necessary to
    access the Device;

s.  Documentation and manuals that may be necessary to access the Device or to
    conduct a forensic examination of the Device;

t.  Records of or information about Internet Protocol addresses used by the Device;
    and

u.  Records of or information about the Device's Internet activity, including firewall
    logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,
    search terms that the user entered into any Internet search engine, and records of
    user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A WESTERN DIGITAL 2 TB HARD DRIVE, CURRENTLY STORED BY THE CHILD EXPLOITATION AND OBSCENITY SECTION OF THE DEPARTMENT OF JUSTICE, LOCATED AT 1301 NEW YORK AVENUE, WASHINGTON, DC 20530 | 25-SW-51 <br><br> <u>UNDER SEAL</u> |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
<u>**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**</u>

I, Daniel Orlando, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of TARGET DEVICE, as described in Attachment A that is currently in the possession of the Child Exploitation and Obscenity Section of the Department of Justice, located at 1301 New York Avenue, Washington, DC 20530. Such a search would include an examination of the seized device for information described in Attachment B.

2.      Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

1

## AFFIANT BACKGROUND

4.      I have been employed as a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), since 2022, and am currently assigned to the HSI Resident Agent in Charge (RAC) Tacoma Office.  While employed by HSI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography.  I have gained experience through training at the Federal Law Enforcement Training Center (FLETC) and everyday work relating to conducting these types of investigations.  I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256(8)(A)) in all forms of media including computer media. Prior to my commission as a SA with HSI, I was a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and had served in that capacity since April of 2019. During my tenure with the FBI, I investigated criminal enterprises, narcotics, violent crime, gang activity, and worked with and alongside the FBI Violent Crimes Against Children (VCAC) investigative group in that office. Aside from my commission as an FBI TFO, I was employed as a Deputy Sheriff and Detective in Central Florida and had been employed as such since 2009. I have participated as a case agent, co-case agent, undercover, and investigative agent in child exploitations, gang related, violent crime, narcotics, and other investigations.

5.      I have also been the affiant on numerous arrest warrants, search warrants, and court orders at the Federal and State level. Over the last approximately 15 years as a sworn law enforcement officer, I have received extensive training and experience concerning investigations of federal and state violations of law. In connections with my duties and responsibilities as an HSI Special Agent, FBI TFO, and Detective, I have testified in federal and state judicial

proceedings and prosecutions for violations of federal and state law. As an HSI Special Agent, I have received extensive training in a variety of investigative and legal matters of violations of federal and state law. I have participated in numerous Child Exploitation investigations as the primary investigator or in a subsidiary role. I have received training regarding investigations of Child Sexual Abuse Material (CSAM)[1] and Child Exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

7.     Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 2252(a)(2) (distribution/receipt of child pornography) and 2252(a)(4)(B) (possession of child pornography) (the "TARGET OFFENSES") has occurred. There is also probable cause to search the TARGET DEVICE, further described in Attachment A, for the things described in Attachment B.

## **IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

8.     The property to be searched is Western Digital 2 TB hard drive, S/N WX62AC0C3XRC, as described in Attachment A that are currently in the possession of the Child

---

1 In this affidavit, I am using CSAM and child pornography, as defined by 18 U.S.C. § 2256, interchangeably.

Exploitation and Obscenity Section of the Department of Justice, located at 1301 New York Avenue, Washington, DC 20530.

## BACKGROUND ON APPLICATION A

9.        Application A is a messaging application that is owned by a company located outside of the United States.  An individual can access Application A through an application installed on a compatible computer or mobile device.  Application A users can message and call other Application A users, can create group conversations, and send photographs, videos, and other files to other Application A users. Application A also provides end-to-end encryption and video calling, voice over Internet protocol, and file sharing, along with several other features. Users can choose to delete messages they have sent or received.  Users are able to delete messages for their device and the device they were communicating with.

10.      Users can join Application A by creating an account linked to a telephone number. Users can set up an account username which can be shared instead of telephone numbers. Up until the recent past, Application A did not provide records to law enforcement, making it an attractive application to use for those who commit crimes.

## BACKGROUND ON VPS

11.      I know based on my training and experience that a virtual private server, also known as a VPS, acts as an isolated, virtual environment on a physical server, which is owned and operated by a cloud or web hosting provider. VPS hosting uses virtualization technology to split a single physical machine into multiple private server environments that share the resources.

12.      Even though you are sharing one physical server with other users, a VPS simulates a dedicated server hosting environment. Your hosting provider installs a hypervisor—a virtual

layer—on top of the operating system (OS) of the physical server that divides it into virtual compartments. This layer enables each of these compartments to run its own OS and software, allowing each environment to function independently from one another. Even though you are technically sharing resources with other users, your resources are guaranteed. You pay for a defined amount, which is allocated to your VPS and cannot be used by another account.

## HSI'S UNDERCOVER ACTIVITY ON APPLICATION A

13.    On February 9, 2024, HSI Tacoma assisted the Washington State Patrol (WSP) Missing and Exploited Children Task Force (MECTF) with the execution of a search warrant and interviews regarding their investigation of an individual, "Co-Conspirator 1," for violations of Washington State laws concerning child exploitation. Through investigative efforts and cooperation from Co-Conspirator 1, HSI Tacoma obtained consent from Co-Conspirator 1 to take control of his numerous online accounts to include his Application A account. Based on the consent provided by Co-Conspirator 1, an HSI UC proceeded to access a specific group on Application A, hereinafter referred to as the "TARGET GROUP." The UC accessed the TARGET GROUP Application A channel in an undercover capacity utilizing Co-Conspirator 1's assumed account. Inside the channel, the HSI UC identified numerous sub-channels of the main TARGET GROUP channel that were named based on categories of Child Sexual Abuse Material (CSAM) content being shared. The titles of the sub-channels were named as follows:

- "Important communications (CAN'T SEND MESSAGES HERE)"
- "Chat"
- "Girls&Lesbians content [0-9yo]"
- "Girls&Lesbians content [10-17yo]"
- "Porn +18 (every category)"
- "Latin content (only minors)"

- "Hentai, 3D, Loli, AI etc. content (only minors)"
- "Afro content (only minors)"
- "Gay&Shemale content (only minors)"
- "Asian content (only minors)"
- "Sets, Film, Model etc. (only minors)"
- "Fetish, Kink, Scat etc. content (only minors)"
- "Homemade&Amateur content (only minors)"
- "General"
- "Raped, Forced Fucks etc. content (only minors)"
- "Mom&Son, Dad&Son, Sister&Brother etc. (only minors)"
- "Social leaks, Live Rec & Links (only minors)"
- "IP-cam, Spy, Creepshots etc. content (only minors)"
- "Hindi content (only minors)"

14.     Law enforcement identified a user named "[ADMIN 1 USERNAME]"[2] who was designated as an "Admin" (Administrator) of the Group. "[ADMIN 1 USERNAME]" was found to have posted several messages where they described the rules of the TARGET GROUP. The rules laid out two separate methods for obtaining membership in the TARGET GROUP.

15.     The first method required that members contribute twenty (20) files of child pornography every twenty-eight (28) days. If members of the channel did not contribute the required number of files, they were automatically removed.

16.     The second method required a donation to various cryptocurrency wallets. If a user chose to donate, "[ADMIN 1 USERNAME]" provided three (3) different cryptocurrency addresses (Bitcoin, Litecoin, and Monero) to send the payment. If a member donated to the

---

2 The true username of "[ADMIN 1 USERNAME]" is known to law enforcement. As they are an ongoing target of law enforcement, the name has been redacted to protect the integrity of the investigation.

cryptocurrency wallets, they received a "Donator" badge on their account profile showing they were a donator to the group. A onetime donation granted the user lifetime immunity from banning.

17.    These rules were strictly followed, with "[ADMIN 1 USERNAME]" employing bots on Application A to count the number of submissions by each member, track duplicate media miles, and expel members that do not share at least twenty child pornography files a month.

18.    The UC observed that child pornography files were being exchanged within the TARGET GROUP, including the files described below. The UC was able to export these child pornography files and other activity and messages in the TARGET GROUP to an undercover device.  The child pornography content available in the TARGET GROUP was not limited to, but included the following:

> a.    Filename: "IMG_4291MP4" – This video is approximately nineteen (19) seconds long and depicts a prepubescent female child, an adult male, and adult female. The female child is unclothed and wrapped in a dark color sheet on a bed in a bedroom. The adult male can be seen rubbing his penis on the female child's genitalia and attempting to insert his penis into her vagina. The female appears to be in distress and can be heard crying throughout the video. An adult female can be heard speaking to the child as the adult male is attempting to insert his penis into her vagina. The adult female appears to strike the female child in the face to have her stop crying while stating "shut up" near the end of the video. Your affiant estimate the female child is under

the age of five (5).[3] This file was shared in the "Mom&Son, Dad&Son, Sister&Brother etc. (only minors)" sub-channel on or about May 15, 2024.

b. Filename: "VID_20240608_144033_323.mp4" – This video is approximately fourteen (14) seconds long and depicts a prepubescent female child and an adult male. The female child is unclothed and can be seen lying on her right side on what appears to be a bed with a white sheet. The adult male can be seen penetrating the female child either vaginally or anally with his penis as the female child can be heard crying. The adult male can be heard speaking to the female child in an unknown language.  I estimate the female child is under the age of seven (7). This file was shared in the "Raped, Forced Fucks etc. content (only minors)" sub-channel on or about June 20, 2024.

c. Filename: "video_2024-06-26_09-48-08.mp4" – This video is approximately sixteen (16) seconds long and depicts a prepubescent female child and an adult male. The female child can be seen wearing a blue in color shirt with white lettering and is unclothed from the waist down. The female child appears to be lying on the floor as the adult male can be seen penetrating her either vaginally or anally. I estimate the female child is under the age of twelve (12). During the video, the adult male can be heard asking the female child "Does it hurt", to which she responds, "A little bit". This file was shared in the "Homemade&Amateur content (only minors)" sub-channel on or about June 11, 2024.

---

3 All estimates of children's ages in this affidavit stem from my observations of the limited breast or genital development of the minors; the lack of any visible pubic hair; and the lack of any indications of puberty.

19.     These videos are generally representative of the content available within the TARGET GROUP, which consisted primarily of numerous types of child pornography including that of prepubescent females. As of approximately September of 2024, the TARGET GROUP became inactive. Up to that point in time, there were approximately 658 members of the child pornography channel, over 78,100 video files, 38,000 images, and 5,700 files of child pornography being actively shared throughout the channel and sub-channels. Based on the quantity of child pornography material that was openly visible in the TARGET GROUP, it is extremely unlikely that a user in the TARGET GROUP would not know that the TARGET GROUP was dedicated to child pornography.

20.     Through the reading of numerous communications in the "Chat" sub-channel, the UC discovered how administrators of the TARGET GROUP were able to defeat Application A's mechanisms for detecting the sharing of child pornography on their servers. To create a new child pornography sharing channel on Application A, the administrator would create an adult pornography sub-channel and upload numerous adult pornography videos and images. Once the sub-channel was loaded with the adult pornography media, the administrator would repeatedly report the channel to Application A as an inappropriate content related channel. After a period of Application A moderators viewing the channel and verifying that it was only adult pornography content, the moderators would no longer attempt to verify the reporting of the channel and would allow the channel and sub-channels to continue to exist. At that point, the administrator would create the additional child pornography related sub-channels and allow child pornography to be shared throughout the channel and sub-channels without fear of the channels being shut down by Application A. It appears this process was followed for the TARGET GROUP based on

communications with the administrator and the single "Porn +18 (every category)" channel that stands out against the rest of the channels solely dedicated to the sexual exploitation of minors.

### ADMIN 2 USERNAME and AlphaVPS

21.    Foreign law enforcement agents from a country that has traditionally provided reliable and accurate information to the United States were also present in the TARGET GROUP. Some of these foreign law enforcement agents spoke in an undercover capacity to another of the administrators of the TARGET GROUP, [ADMIN 2 USERNAME]. [ADMIN 2 USERNAME] provided the foreign law enforcement agents the following MEGA link during their communication:

- http://mega.nz/folder/LREhBLiQ#[REDACTED]eU-p2g

22.    On or about October 7, 2024, I served a DHS Summons to Mega Ltd. regarding the above referenced link. On or about the same date, I received responsive documents from Mega Ltd. via email. I reviewed these documents, and several IP addresses were found to be potentially associated to [ADMIN 2 USERNAME] based on investigative review of undercover chats between [ADMIN 2 USERNAME] and foreign law enforcement undercover agents. During these chats, [ADMIN 2 USERNAME] made comments regarding being in possession of controlling a VPS housing multiple terabytes of CSAM and back-up(s) of the TARGET GROUP content, including the CSAM hosted on the TARGET GROUP. Three (3) IP addresses believed to be related to [ADMIN 2 USERNAME] obtained from the Mega Ltd. summons return are listed as follows:

- 104.152.49.141 (ISP: "DA International Group Ltd.") - Germany

- 31.164.243.46 (ISP: "Sunrise GmbH") - Switzerland

- 78.208.214.87 (ISP: "Iliad Italia") - Italy

An open-source search of "DA International Group Ltd." revealed that the company's profile included a VPS company called "AlphaVPS".

23.      On or about October 8, 2024, I served a DHS Summons to DA International Group Ltd. (AlphaVPS) regarding IP address "104.152.49.141." The next day, DA International Group Ltd. (AlphaVPS) responded with the following information:

- "This IP address is used by a user, who signed up via our website https://alphavps.com/ and is utilizing a VPS from our company AlphaVPS - specifically - Storage-3TB plan from https://alphavps.com/storage-vps.html . Below you can find additional information that we have on-file for the user of this IP address."
- First Name: gionni
- Last Name: Mustafa
    - o   Initial Order Date:
    - o   Date: 23/08/2024 14:50
    - o   Payment Method: PayPal
    - o   Order #: 1985371972 (ID: 31059)
    - o   IP Address: 31.164.243.46
- All payments for our services were processed via the system of PayPal and we have the following recorded transactions:
    - o   20/09/2024 PayPal Invoice Payment (#111251) - Trans ID: 1RR19761FS580035P €15.00EUR
    - o   27/08/2024 PayPal Invoice Payment (#110330) - Trans ID: 2F598009CX095750L €8.71EUR
    - o   23/08/2024 PayPal Invoice Payment (#110056) - Trans ID: 07A028464F551583N €5.00EUR
- According to PayPal, the account holder of the PayPal account that processed these Trans ID is:
    - o   Name: Paolo Sartori
    - o   Email: "paolo.sartori04@gmail.com"

The IP Address provided is one of the IP addresses associated with [ADMIN 2 USERNAME].

24.     On or about December 17, 2024, I contacted "DA International Group Ltd." (AlphaVPS) to request feedback on the proper process of potentially obtaining a copy of [ADMIN 2 USERNAME]'s VPS in furtherance of this investigation. AlphaVPS Chief Executive Officer responded that he would voluntarily give a copy of the VPS to me. On December 23, 2024, the CEO notified me that he had successfully obtained the data from his servers, uploaded the data to a server in Texas (United States), and provided a link to download the contents of the server. On or about the same date, I provided this download link to the Department of Justice's (DOJ) Child Exploitation and Obscenity Section (CEOS). On or about January 3, 2025, a digital examiner downloaded the content onto a Western Digital 2 TB hard drive, S/N WX62AC0C3XRC.

## THE TARGET DEVICE

25.     I have experience investigating the statutes underpinning probable cause. Between at least February of 2024 and September of 2024, [ADMIN 2 USERNAME ] was a member of TARGET GROUP, a channel dedicated to the sexual exploitation of children. In October of 2024, [ADMIN 2 USERNAME] indicated he saved all of TARGET GROUP to his VPS, including the child pornography. The data from the VPS was downloaded to the TARGET DEVICE. In summation, the execution of a search warrant on the TARGET DEVICE would allow law enforcement to, among other things: identify who used the VPS data contained on the TARGET DEVICE, identify the existence of child pornography on the TARGET DEVICE, and provide information on when the VPS server was  was used and where. All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES.

## BACKGROUND ON COMPUTERS, CELLULAR DEVICE, AND CHILD PORNOGRAPHY

26.     Based on my training and experience in child exploitation investigations, I am aware that computers, including virtual private servers ("VPS"), computer technology, and the Internet significantly facilitate child pornography offenses.  Computers, including VPS, generally serve five (5) functions in connection with child exploitation offenses: production, communication, distribution, storage, and social networking.  Child pornography offenders can transpose photographic images from a camera into a computer-readable format with a scanner.  With digital cameras, the images can be transferred directly onto a computer or cellular device.  A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Therefore, through use of the Internet, electronic contact can be made to literally millions of computers or cellular Device around the world.

27.     A computer's and VPS' ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown significantly within the last several years.  These drives can store thousands of images at very high resolution.  In addition, VPS', which are cloud-based, can hold hundreds of thousands of media files, websites, and much more with users imply upgrading their storage capacity as they need more.

28.     Even when CSAM files have been deleted from a computer or VPS server, they can be recovered months or years later using readily available forensic tools.  When a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside on the hard drive in space that is not allocated to an active file for long

13

periods of time before they are overwritten. A computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

### CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN OR VISUAL DEPICTIONS OF CHILDREN

29.     Based upon my training and experience, as well as upon information provided to me by other law enforcement officers, there are certain characteristics common to individuals who receive, possess and/or access with intent to view child pornography, which may be exhibited in varying combinations:

a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity. Due to the accessibility and availability of child pornography on the Internet, in my recent experience, instead of maintaining collections, some offenders engage in a pattern of viewing or downloading child pornography online and then deleting the material.

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. They may also use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

14

c.    Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.    These collections can be maintained for several years to enable the individual to view the collection, which is valued highly.

d.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

e.    Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.    This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

f.    Individuals whose sexual interest in children or images of children has led them to purchase access to paid websites or other commercial sources of child pornography frequently maintain the financial records of those transactions at their residences.

## **TECHNICAL TERMS**

30.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, VPS, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage Device. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing Device (including, but not limited to, central processing units, internal and peripheral storage Device such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

16

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication Device and can be used to access the Internet or other wired or wireless Device through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location,

and often retains records of its historical locations. Some GPS navigation Device can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security Device may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption Device, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital Device on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic Device that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between Device on the Internet often cross state and international borders, even when the Device communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

19

m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

31.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the TARGET DEVICE, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as

VHS); and security Device. Thus, the warrant applied for would authorize the seizure of digital Device or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital Device, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

      a.   Individuals who engage in criminal activity, including those with a sexual interest in children, often hide their contraband on digital devices or those devices connected to the internet, as described above.

      b.   Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      c.   Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long

periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

32.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital Device, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the device(s) at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable

from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital Device were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital Device is evidence may depend on other information stored on the Device and the application of knowledge about how the Device behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.  I know that when an individual uses a digital device to produce child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as

to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICE

33.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital Device can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital Device and software programs in use today. Digital Device – whether, for example, desktop computers, mobile Device, or portable storage Device – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital Device, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital Device can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital Device also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital Device.

c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.    Digital device users can attempt to conceal data within digital Device through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital Device, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic

examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital Device may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.    Analyzing the contents of mobile Device, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile Device require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile Device used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio

application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the Device. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

    34.    The volume of data stored on many digital Device will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

        a.    Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

            i.    Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICE to an appropriate law enforcement laboratory or similar facility for review. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

ii.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

35.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET DEVICE contains evidence of the TARGET OFFENSES.

36.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

37.     I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICE is contained on the premises of the Child Exploitation and Obscenity Section of the Department of Justice, located at 1301 New York Avenue, Washington, DC 20530.

Respectfully submitted,

_____

Daniel Orlando
Special Agent, HSI

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 4th day of March, 2025.

_____

MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE